## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. PWG-20-412** |
| | ) | |
| **ANITA FORTUNE,** | ) | |
| | ) | |
| **Defendant** | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Anita Fortune, who has previously been convicted for tax fraud, filed numerous false returns for clients and took elaborate steps to conceal her identity after multiple IRS actions. Given these circumstances, the United States of America respectfully requests that this Court sentence the Defendant to 30 months' imprisonment, which is at the high end of her Sentencing Guidelines range of 24 to 30 months. A sentence of 30 months is necessary to provide just punishment for the offense and to promote the important aims of deterrence and respect for the tax laws. The government also respectfully requests that this Court order the Defendant to pay restitution to the IRS in the amount of $189,748, in accordance with the Defendant's plea agreement. Plea Agreement ¶ 14, ECF No. 11.

## BACKGROUND

### I.    Procedural History and Sentencing Guidelines Computations

On March 5, 2021, the Defendant pleaded guilty to Counts One and Two of the Indictment charging her with conspiracy to defraud the United States, in

violation of 18 U.S.C. § 371, and aiding and assisting in the preparation and filing

of a false tax return, in violation of 26 U.S.C. § 7206(2). ECF No. 6.

Pursuant to the plea agreement, and in accordance with the United States

Sentencing Guidelines ("U.S.S.G."), the parties have stipulated to the offense level

calculated below. Because the Defendant pleaded guilty in a timely manner, the

government plans to move that the Defendant be granted three points for

acceptance of responsibility:

| Guideline | Offense Level |
|---|---|
| Base Offense Level (U.S.S.G. § 2T4.1) (loss amount exceeding $100,000) | 16 |
| Tax Preparer Enhancement (U.S.S.G. § 2T1.4(b)(1)(B)) | 2 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1) | -3 |
| **TOTAL** | **15** |

The presentence report's calculations of the Defendant's base offense level

and points for acceptance of responsibility are consistent with the government's

calculations. PSR ¶ 28. Given the Defendant's criminal history category of III,

PSR ¶ 38, an offense level of 15 carries a Guidelines Range of 24 to 30 months'

imprisonment.

## II.   <u>Offense Conduct</u>

The Defendant prepared and filed numerous false tax returns for her clients.

The false returns included both inflated and fictitious itemized deductions and

business expenses. With the help of her co-conspirators, the Defendant also

concealed her identity in the face of repeated enforcement actions by the IRS. The

2

conspiracy operated successfully for many years.

Though a resident of Alexandria, Virginia, the Defendant primarily worked from an office in Temple Hills, Maryland. Beginning in at least 2012, the Defendant's clients knew her business by the name "Tax Terminatorz." However, as explained further below, the Defendant ultimately signed tax returns using varying business names, which she used to conceal her involvement in the conspiracy.

Due to a prior conviction for wire fraud in 2007, as well as different felony conviction in 2001, the Defendant would not be able to pass the IRS's required suitability check to register Tax Terminatorz for an Electronic Filing Identification Number ("EFIN"). Without an EFIN, the Defendant could not provide electronic tax filing services to her clients.

Rather than accept this reality, the Defendant chose the path of deception. She recruited her sister, co-conspirator Lenore Worthy ("Worthy"),[1] to join the Defendant's business in Temple Hills. Worthy, who was also a tax preparer, already had a valid EFIN for a business called "United Tax Services." Worthy improperly allowed the Defendant to use United Tax Services' EFIN in exchange for a fee of $29 for each return that the Defendant filed. The Defendant and

---

[1] Co-conspirator Worthy pleaded guilty to the same charges in a related case, docketed at Case No. PWG-21-64 (D. Md.).

Worthy also shared a Drake Software account (professional tax preparation computer software), as well as an account with Republic Bank that allowed them to deduct their fees directly from their clients' tax refunds. Thus began a scheme by which the Defendant misrepresented her identity and activities to the IRS.

Using the shared Drake account, the Defendant electronically filed her clients' tax returns using Worthy's EFIN and other IRS identifiers. Because she was not allowed to file returns under her own business name, any tax preparer fees that the Defendant earned through Republic Bank's direct deposit program were comingled with fees earned by Worthy. Therefore, the co-conspirators were forced to allocate their fees from a shared bank account. The Defendant's clients were unaware of the scheme because, unlike the versions of their tax returns that the Defendant filed with the IRS, copies that the Defendant gave to her clients did not contain Worthy's name or EFIN. **Exhibit 1** provides an example of one such discrepancy in the return preparer's signature block.

Meanwhile, the Defendant also deliberately misrepresented her clients' information to the IRS. For example, on the tax return referenced in Count 2 of the Indictment, the Defendant added fake moving expenses and Schedule A itemized deductions totaling over $20,000, artificially lowering the client's taxable income by nearly 45 percent. Plea Agreement, Att. A. That allowed the Defendant to claim a refund of nearly $2,000 on the client's behalf, even though the client should not

4

have received any refund. *Id.* Because that client was actually an IRS undercover agent, he recorded his interaction with the Defendant. Based on that interaction, as well as another undercover operation against Worthy, the IRS shut down Worthy's EFIN in August 2015. *Id.*

Undeterred, the Defendant and Worthy solicited the help of another sister, co-conspirator Veronica Fortune ("Veronica").[2] Like Worthy, Veronica was also a tax preparer and owned a valid EFIN for a business called "Fortune's Professional Services." Fortune, now along with Co-Conspirator Worthy, continued to misrepresent her identity on her clients' tax returns, this time using Veronica's EFIN and other identifiers. The Defendant's clients remained unaware of the scheme because they received copies of their tax returns that differed from the copies that the Defendant ultimately submitted to the IRS. **Exhibit 1** provides additional examples of these discrepancies.

Based on its investigation of the new EFIN, the IRS shut it down in December 2017. *Id.* Still undeterred, the Defendant, Worthy, and Veronica began using a fourth party's EFIN, which was registered to a business called "Refunds-To-Go." According to that EFIN provider, Veronica misrepresented the reason for the co-conspirators' troubles with the IRS. Specifically, Veronica claimed to have

---

[2] Co-conspirator Veronica Fortune also pleaded guilty to the same charges in a related case, docketed at Case No. PWG-21-65 (D. Md.).

fallen behind on her personal tax returns, rather than admitting to a criminal investigation by the IRS.[3] With their new EFIN, the conspirators continued to prepare returns through at least the 2019 filing season.

## ARGUMENT

### I.   Sentencing Recommendation

As the Court is well aware, the Sentencing Guidelines are advisory, and just one factor that must be considered along with the other factors set forth in 18 U.S.C. § 3553(a).[4] In this case, a sentence to 30 months is necessary to reflect the financial harm the Defendant caused the United States, the egregious nature of her conduct, her history of tax fraud, and her continued fraud even after signing the present plea agreement. Furthermore, given the Defendant's blatant disregard for the nation's laws and the integrity of its treasury, a significant prison term is necessary to send a message of deterrence, both to this Defendant and others.

---

[3] Because this fact is stipulated in the plea agreement, the government does not intend to call this witness to further discuss the conspirators' misuse of the fourth party's EFIN. However, the IRS agent who investigated the case will be available to testify and provide additional context, based on the agent's interviews with the additional EFIN owner, as needed. The government notes that to the extent that such testimony is needed, hearsay is admissible in the sentencing context.

[4] The § 3553(a) factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed training, medical care, or other treatment; the kinds of sentences available; the kinds of sentence and the sentencing range established for the type of offense committed; any pertinent policy statement; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

## A. The Nature and Circumstances of the Offense

The stipulated tax loss only partially reflects the seriousness of the offense. It does not fully explain why the Defendant's fraud was so serious in this case. The Indictment alleged that the conspirators prepared and filed an additional 57 false returns during the 2012 through 2019 filing seasons.[5] **Exhibit 2** summarizes the false items investigated, and it emphasizes particularly egregious items. The stipulated tax loss of nearly $190,000 accounts for most of the items in **Exhibit 2**, omitting any computations that the IRS had not completed when the Defendant signed the agreement.

Closer inspection of **Exhibit 2** indicates that a numerical measure of loss fails to fully capture the egregious nature of the Defendant's fraud. That is because the Defendant and her co-conspirators' pattern of behavior was not limited to mere padding of expenses and deductions. The conspirators fabricated entire businesses that did not exist, just so they could claim phony business losses on their clients' Schedules C. *See* **Ex. 2**. Of the 58 total returns, 15 reported expenses for businesses that either never existed or were defunct. *See id.* Twenty more returns claimed expenses for businesses that existed but nevertheless required no expenses by the owners. *See id.*

---

[5] Thirty-nine returns were alleged as substantive counts. The government intends to move the court to dismiss the remaining 38 counts after it sentences the Defendant on Count One (the conspiracy) and Count Two (the first false return count). The 20 returns for tax years 2011 through 2013 described in **Exhibit 2** were charged only as overt acts in the conspiracy.

For example, on Taxpayer 4's 2016 Form 1040, the Defendant added a side job as a purported "cheerleading manager." However, Taxpayer 4 was never a cheerleading manager and never operated any side businesses. Nevertheless, the Defendant added bogus businesses expenses to generate losses on the client's Schedule C, lowering the taxable income, and increasing the refund. *See id.* Those false expenses were not mere exaggerations but rather willful fabrications, and they constituted brazen fraud.

The data in **Exhibit 3** further indicates that the fabrications detailed in **Exhibit 2**, such as nonexistent businesses, were not mere anomalies in behavior but rather were part of a broader pattern. The ratio of refunds that the conspirators' claimed in relation to the total returns they filed averaged as high as 93 percent in a single year. *See* **Ex. 3**. That refund rate was far higher than the state and national averages every year. The Defendant and her co-conspirators also claimed Schedule A itemized deductions and Schedule C business expenses at significantly higher-than-average rates. *See id.* Moreover, their pattern remained consistent over time, despite warning after warning from the IRS.[6]

Based on these patterns, the stipulated loss provides only a conservative

---

[6] For example, when the IRS shut down both Worthy and Veronica's EFINs, it sent them letters stating that the reason for each shutdown was a criminal investigation into false returns prepared with each EFIN. *See* **Ex. 4**; **Ex. 5**. IRS Criminal Investigations agents also spoke with each co-conspirator separately in 2015 and 2018.

accounting of the harm caused by the conspiracy. To that end, **Exhibit 6** conceptualizes the IRS's most forgiving view of how serious and widespread the conspirators' conduct realistically was, dating back to the 2013 tax year. When gathering the data comprising **Exhibit 6**, the IRS focused only on the Schedules C that reported net losses. Nationally, the average net losses claimed on loss-generating Schedules C was around 25 percent each year. *See* **Ex. 6**. Removing and disregarding business losses that exceeded national averages on the conspiracy's returns, and using a conservative 10-percent tax rate on the resulting unreported income, the IRS estimates additional harm as high as $711,996. *See id.* Notably, that conservative estimate disregards all potential Schedule A falsehoods, even though, consistent with the allegations in **Exhibit 2**, as well as Count 2 of the Indictment, the investigation found that the conspirators regularly exaggerated and fabricated itemized deductions on the Schedules A.

Further compounding the seriousness of the Defendant and her co-conspirators' conduct was that they profited from their brazen fraud each year. As **Exhibit 7** shows, their business was prolific. Together, they filed over 9,300 tax returns claiming nearly $30 million in refunds for tax years 2011 through 2018. Because of their high output, their fraudulent enterprise earned them hundreds of thousands in fees each tax season, which generally lasts less than four months. From this data one can infer that their fraud was not just opportunistic. It was an

intentional business model. Indeed, Worthy explained the model best during her undercover operation, after she announced the approximately $4,500 refund that she had claimed for an undercover agent: "So that's why I charge $350."

Finally, the tax loss alone does not accurately reflect the investigative resources the conspirators caused the IRS to divert to their investigation. **Exhibit 7** also illustrates this aspect of the conspiracy by providing a timeline of the conspirators' use of varying EFINs, along with a tally of the thousands of returns they prepared with each one. This data helps demonstrate how the conspirators' misrepresentations about their identities made their years-long scheme so successful. Each time the IRS discovered and shut down an EFIN that the conspirators shared, they simply found a new EFIN to abuse. As they shared more EFINs, as well as Drake software accounts and fee-receiving bank accounts, the conspirators also progressively escalated the IRS's confusion about their identities.

This effective strategy caused significant strain on investigative resources. The IRS was unable to verify who prepared which returns until each client confirmed a conspirator's identity in a photo line-up. Consequently, the conspirators sustained their scheme until the IRS could investigate enough individual tax returns to prove that each conspirator's filing of false returns was *i*) the result of deliberate misrepresentations and *ii*) part of a widespread and intended pattern.

A sentence of 30 months is necessary to reflect the seriousness of the Defendant's crimes. Her fraud was egregious, widespread, and designed to successfully evade detection.

**B. The History and Characteristics of the Defendant**

The Defendant is a repeat offender. Notably, she has a prior federal conviction for fraud against her tax preparation clients. **Ex. 8**, Statement of Facts (Jan. 18, 2007). In that case, which was prosecuted in the Eastern District of Virginia, the Defendant admitted to stealing from her clients by diverting all or part of their tax refunds from the IRS into the Defendant's own bank accounts. *Id*. The Defendant's criminal record also includes shop lifting, providing false identification to the police, credit card fraud, and check fraud. *See* PSR ¶¶ 32-36.

Additionally, the Defendant appears to have committed an additional fraud after signing her plea agreement in this case. After the Defendant's March 5, 2021 plea hearing, the government received a tip that she had fraudulently obtained a Small Business Association ("SBA") loan pursuant to the Coronavirus Aid, Relief, and Economic Security Act's Paycheck Protection Program ("PPP"). In response to the tip, the government obtained documents associated with the Defendant's loan. **Exhibit 9** is the Defendant's loan agreement, dated March 1, 2021, which shows that the Defendant's business, Tax Terminatorz, received an SBA PPP loan of $9,267.01. **Ex. 9**. The SBA disqualifies from the program applicants who are

subject to any formal felony charges, including by indictment.[7] Additionally, the

Defendant was required to confirm the number of employees at Tax Terminatorz

by providing recent tax returns and required to use the loan to continue her

operation of the business.

      The Defendant deceived the SBA on all three requirements. As to the felony

certification, the Defendant was aware that on November 23, 2020, she had been

indicted on forty counts of felony charges as part of the instant case. In fact, three

months prior to entering into the SBA PPP loan, the Defendant signed her plea

agreement (on December 18, 2020) in which she agreed to plead guilty to two

felony counts. Plea Agreement at 9, 11. Nevertheless, the Defendant applied for

and received a loan from the federal government to operate her tax preparer

business.

      As to employees, the Defendant lied to the SBA by claiming that she

employed four people. To corroborate that claim, the Defendant provided the SBA

with a 2019 tax return (*see* **Ex. 10**, 3), that differed from the 2019 return that she

had actually filed with the IRS (*see* **Ex. 11**, 3).[8] Specifically, the Defendant's true

return did not claim employee expenses; whereas, the SBA version claimed

---

[7] *See* "Felon Participation," *available at* https://www.sba.com/funding-a-business/government-small-business-loans/ppp/faq/felon-participation/.
[8] The government notes that the business name on the Defendant's Schedule C is not Tax Terminatorz but is consistent with the name of a business bank account she previously used for tax preparation fees. However, the employment tax returns discussed below use the name Tax Terminatorz.

"contractor expenses." *Id.* The Defendant also sent the SBA several fictitious employment tax returns that she had never filed with the IRS. *See, e.g.*, **Ex. 12**, 4th Quarter 2020 Form 941.

Finally, as to continuing business operations, it is unclear whether the Defendant lied to the SBA or rather to her Probation Officer about the status of Tax Terminatorz in 2021. The Defendant recently told her Probation Officer that she had stopped operating Tax Terminatorz altogether in January 2021. PSR ¶ 63. Of course, the Defendant's plea agreement also prohibited her from participating "in any way" in the business of preparing tax returns. Plea Agreement ¶ 12.

### C. The Sentence Should Be Sufficient to Deter the Defendant and Others from Engaging in Similar Conduct.

The government has a heightened concern about specific deterrence in this case. The Defendant is a repeat fraudster. Previously, she used her business to enrich herself by stealing directly from her clients. After her conviction for those crimes, she used her business to enrich herself by defrauding the IRS. Most recently, even after executing her plea agreement in this case, she used her business to enrich herself by defrauding the SBA. A sentence of 30 months is necessary to deter the Defendant from defrauding others in the future.

Regarding general deterrence, a sentence of imprisonment is important in tax cases because this country's federal tax system relies on voluntary compliance. In such a system, taxpayers may be tempted to judge their personal gains to outweigh

any harm that one individual could cause to the system. This is particularly true for tax preparers who, like the Defendant, see profits in crime. Therefore, it is important to ensure that taxpayers' cost-benefit analyses lead them toward compliance. Without adequate deterrence, the United States would be unable to "protect the public interest in preserving the integrity of the nation's tax system." United States Sentencing Guidelines, Ch. 3, pt. T, intro. cmt.

General deterrence is especially important given the "limited number of criminal tax prosecutions relative to the estimated incidence of such violations." *Id.* This scarcity of tax prosecutions relative to the instances of tax fraud reflects the limited availability of resources necessary to conduct and prosecute those cases. According to recent figures from the United States Sentencing Commission, there were only 517 prosecutions for tax fraud in fiscal year 2018, which represent a mere 0.7 percent of all defendants sentenced in federal prosecutions.[9]

Thus, the Sentencing Commission's emphasis on deterrence in tax cases is sound. The Fourth Circuit also endorsed that emphasis on general deterrence in tax cases when, in *United States v. Engle*, it vacated a probationary sentence imposed on a Defendant convicted of tax evasion. Calling the Sentencing Commission's emphasis on incarceration "wise," that court opined: "the vast majority of [tax]

---

[9] *See* "Quick Facts: Tax Fraud Offenses" (August 2019), *available at* https://www.ussc.gov/research/quick-facts/tax-fraud.

crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path." 592 F.3d 495, 501 (4th Cir. 2010). The government agrees and argues that sentencing the Defendant to 30 months in prison would send a necessary and effective message to both this Defendant and to other taxpayers and tax preparers.

## <u>CONCLUSION</u>

The government respectfully recommends a sentence of **30 months'** imprisonment. That sentence, which is at the high end of the recommended Guidelines Range, is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Respectfully submitted,

UNITED STATES OF AMERICA,
By its Attorneys,

David A. Hubbert
Acting Assistant Attorney General
U.S. Department of Justice
Tax Division

Jonathan Lenzner
Acting United States Attorney
U.S. Attorney's Office for the District of
Maryland

By:    */s/*Kathryn D. Sparks
KATHRYN D. SPARKS
Trial Attorney
Tax Division
150 M St. NE
Washington, D.C. 20002
P: (202) 353-0701
F: (202) 616-1786

LEAH B. GROSSI
Assistant United States Attorney
U.S. Attorney's Office for the District of
Maryland

Date:  May 21, 2021

CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of May, 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered CM/ECF participants. I also certify that on the same date I have mailed the document by United States Postal Service to the following non-CM/ECF participants:

/s/ Kathryn D. Sparks
KATHRYN D. SPARKS
*Trial Attorney*